STATE OF NEBRASKA, APPELLEE, V.
DANIEL L. OWENS, APPELLANT.
601 N.W. 2d 231

Filed October 8, 1999. No. S-98-080.

James Walter Crampton for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Daniel L. Owens was tried and found guilty of second degree murder, discharging a firearm at an occupied vehicle, and use of a weapon to commit a felony. The Nebraska Court of Appeals reversed Owens' convictions and remanded the cause for a new trial. *State v. Owens*, 8 Neb. App. 109, 589 N.W.2d 867 (1999). In its opinion, the Court of Appeals determined that under *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981), Owens was entitled to a self-defense instruction regarding all "the other occupants of the Jeep." *Owens*, 8 Neb. App. at 116, 589 N.W.2d at

872. The Court of Appeals also determined that the district court erred in not allowing testimony regarding a prior inconsistent statement made by Jennifer Jaderborg, Owens' former girl friend. The State petitioned for further review of the decision of the Court of Appeals, which this court granted.

## FACTUAL BACKGROUND

On June 18, 1997, Joel Kudym, Karen Zarp (Zarp), Jason Zarp, and Jeremy Jesionowicz were driving north in a Jeep Cherokee on Highway 50, between Louisville and Springfield, Nebraska. The four teenagers were returning home to Springfield after a trip to Louisville to get "Slushies" for Jason Zarp and Jesionowicz. Kudym, Zarp's boyfriend, was driving. Kudym and Zarp were sitting in the front of the Jeep, and Jesionowicz and Jason Zarp were sitting in the back.

As they turned onto Highway 50 to go home, they noticed a blue Ford Escort. The teenage passenger in the Escort, Owens, was seated in the right front passenger's seat and was throwing lit bottle rocket fireworks out his window. His girl friend, Jaderborg, was driving. Owens had been to a shooting range for target practice earlier in the evening and had an FEG Hungary 380 automatic pistol in the Escort with him.

Zarp called the 911 emergency service to report that the passenger in the Escort was throwing fireworks onto the highway. During the 911 call, Zarp believed the dispatcher told her to stay behind or follow the Escort. She told Kudym to follow the Escort, which he did for approximately 6 to 11 miles. The Jeep never touched the Escort. The distance between the two vehicles varied, but the Jeep basically stayed within sight of the Escort. Owens, noticing that the Jeep seemed to be following them, took out his gun and placed it in his lap.

As the Jeep followed the Escort, Kudym and Zarp were talking and listening to the radio in the front seat, while Jesionowicz and Jason Zarp were talking in the back. As they approached a red light at the intersection of Interstate 80 and Highway 50, the Jeep moved over into the right-hand lane, intending to turn right. The four teenagers had decided to stop following the Escort and return home.

The two vehicles stopped at the light with the back passenger's seat of the Jeep, where Jesionowicz was sitting on the left-hand side, even with the Escort's front passenger's seat, where Owens was sitting. There were no cars in front of the Jeep or the Escort. According to the testimony of Zarp, Jason Zarp, Jesionowicz, and Jennifer Levenhagen, the driver of a car stopped directly behind the Escort at the intersection, no one yelled or waved at the Escort and no one attempted to get out of the Jeep. When Jesionowicz looked over at the Escort, he saw a gun being pointed at the Jeep by Owens. Jesionowicz grabbed at Zarp and Jason Zarp to pull them down.

Owens shot into the Jeep three times. According to Owens' testimony, he first shot into the rear window of the cargo area because "[n]obody was back there." The rear cargo window shattered. He then shot two more times into the front of the vehicle. Owens testified that "I figured if I could scare the driver he would take off." One of these shots struck the door panel behind the front passenger's seat. The other shot struck Kudym in the side of his head.

After the shots were fired, the Jeep began moving because Kudym's foot was on the gas pedal. Jesionowicz reached over from the back and steered the Jeep, while Zarp pulled on the emergency brake. They eventually managed to stop the Jeep. The Escort drove off. Despite emergency medical efforts, Kudym died from severe head injuries.

Owens was arrested and charged with second degree murder, shooting at an occupied structure or vehicle, and use of a firearm to commit a felony. At trial, Owens testified that he was concerned for his safety when the Jeep began following them. His concern increased when the Jeep pulled up next to him at the intersection. According to Owens, Jesionowicz was yelling at him and flashing what Owens believed were gang signs. The other occupants of the car were "looking at [him] mean." Owens said he saw Jesionowicz reach under his seat for something, which Owens thought could be a gun. Then Owens thought Jesionowicz reached for the door handle to get out of the Jeep. The Jeep's door was never opened. Owens testified that he did not intend to shoot anyone.

Jaderborg, Owens' former girl friend, testified that she noticed the Jeep following them. She did not see any exchange at the intersection between Jesionowicz and Owens before the gunshots, except that Jesionowicz called out to Owens and asked if he wanted to start something. Jaderborg further stated that after he fired the three shots, Owens said, "I think I saw some glass break. I hope I shot someone." They then drove off.

When the instructions were reviewed prior to submission to the jury, the defense objected to instruction No. 9. The instruction read in part as follows: "The defendant acted in self defense if: (1) Joel Kudym threatened death or serious bodily harm."

The defense attorney requested that the instruction be corrected to read that "the occupants of the Jeep Cherokee" threatened death or serious bodily harm, rather than limiting the instruction just to the actions of Kudym. This request was denied. The State did not object to the giving of a self-defense instruction. The jury found Owens guilty of all charges, and judgment was rendered accordingly.

## ASSIGNMENTS OF ERROR

The State asserts in its petition for further review, rephrased, that the Court of Appeals erred in (1) determining that a proper instruction on self-defense must direct the jury to consider the threatening actions of people other than the actual victim in determining whether the use of force was justified and (2) determining that the testimony of Laura Carey regarding a prior inconsistent statement made by Jaderborg was erroneously excluded.

## STANDARD OF REVIEW

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999).

■ In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Sanchez, ante* p. 291, 597 N.W.2d 361 (1999).

## ANALYSIS

### SELF-DEFENSE INSTRUCTION

■ The State asserts that no error occurred when the trial court refused Owens' tendered instruction on self-defense. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Harrold*, 256 Neb. 829, 593 N.W.2d 299 (1999); *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999). We determine that the self-defense instruction tendered by Owens was not a correct statement of the law.

■ The justification of the use of force in self-defense is a statutorily defined affirmative defense in Nebraska. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997); Neb. Rev. Stat. § 28-1416(1) (Reissue 1995). Under the language of Neb. Rev. Stat. § 28-1409(1) (Reissue 1995), "[T]he use of force upon or toward another person is justifiable when the actor believes such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by *such other person* on the present occasion." (Emphasis supplied.)

■ The language of § 28-1409(1) makes clear that the excuse of self-defense is applied to the threatening behavior of "another person," not to a generalized group of actors. Merely identifying a group of possible assailants, such as "the occupants of the Jeep Cherokee," and directing the jury to consider whether anyone in this group threatened the defendant, impermissibly broadens the application of § 28-1409. It is a fundamental principle of statutory construction that penal statutes are to be strictly construed. *State v. Garza, supra.* See, also, *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998). Thus, the instruction as tendered by Owens was not a correct statement of the law. See *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998).

The Court of Appeals found that the instruction offered by Owens was warranted, notwithstanding the language of § 28-1409, based on our holding in *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981). In *Duis*, David Moss and Craig Duis became involved in an altercation in the parking lot of a restaurant, consisting mostly of name-calling. Duis drove off, firing three shots in the direction of Moss as he left. Duis claimed that he shot at Moss because he believed Moss was reaching for a weapon. The shots fired by Duis at Moss struck Moss' friend, Allan Ray Veasley, once in the thigh. No one else was injured.

Duis intended to shoot Moss but accidentally shot Veasley. Duis was then charged with the intentional assault of Veasley under a theory of transferred intent. The theory of transferred intent allows Duis' intent to assault Moss to "transfer" to the shooting of Veasley. See *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991). At Duis' trial, the jury was instructed on the issue of self-defense. They rejected Duis' claim of self-defense and found him guilty of assault in the second degree.

Duis appealed, asserting that the self-defense instruction given to the jury was flawed. The instruction was essentially a direct quote of § 28-1409, and did not identify either Moss or Veasley as the person who threatened Duis. We recognized the doctrine of transferred self-defense implicit in *Duis* by stating, "Undoubtedly, it would have been more precise had the instruction explained to the jury that if the defendant was justified in using force toward Moss, he was justified in the force employed, which mistakenly struck the actual victim." 207 Neb. at 856, 301 N.W.2d at 590. Just as transferred intent allowed Duis to be prosecuted for an intentional assault on Veasley, transferred self-defense allowed Duis to raise a claim of self-defense based on Moss' actions.

In *Duis*, we determined that the instruction given to the jury was correct because it was taken directly from the statute and because the defendant did not offer an alternative instruction. Nowhere in *Duis* do we expand § 28-1409 to allow a claim of self-defense against a general group of actors present when the incident took place.

In finding that Owens was entitled to an instruction on self-defense regarding the "occupants of the Jeep Cherokee," the

Court of Appeals incorrectly applied *Duis*. The facts presented in the instant case do not involve transferred intent, as did *Duis*. There is no evidence that Owens intended to shoot Jesionowicz but instead hit Kudym accidentally. Owens never testified that he intended to shoot Jesionowicz, and all three shots were aimed either behind or in front of Jesionowicz.

Owens was prosecuted, tried, and convicted by the jury of second degree murder as a result of Kudym's death. Notwithstanding Owens' claim that he did not intend to shoot Kudym, the jury found otherwise. By Owens' being charged with causing Kudym's death intentionally but without premeditation, see Neb. Rev. Stat. § 28-304(1) (Reissue 1995), it is clear that under the facts presented by this record the "other person" referred to in § 28-1409(1) was Kudym. Instruction No. 9 was, therefore, a correct statement of the law, and the trial court did not err in refusing Owens' proposed instruction. *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981), does not expand the scope of § 28-1409 beyond threats raised by "another person" so as to entitle a defendant to a self-defense instruction covering, as Owens claims, the actions of "the occupants of the Jeep Cherokee."

We do not reach the issue of whether Kudym's actions in following the Escort and pulling up beside it provided sufficient evidence to have even warranted a self-defense instruction. The State did not object to the giving of a self-defense instruction at trial. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

## PRIOR INCONSISTENT STATEMENT

The State also asserts that the Court of Appeals incorrectly determined that it was error to refuse to let Laura Carey, Owens' mother, testify that Jaderborg had told Carey that Owens said, "I hope I didn't shoot somebody" as they drove off. At trial, Jaderborg testified that Owens had said, "I hope I shot somebody" as they drove off. The defense sought to elicit the testi-

mony from Carey as evidence of Jaderborg's prior inconsistent statement.

 Neb. Rev. Stat. § 27-613(2) (Reissue 1995) permits the introduction of evidence concerning prior inconsistent statements by a witness, subject to the limitation that the witness being impeached must be given an opportunity to explain or deny the prior inconsistent statement, and the opposite party must have the opportunity to interrogate the witness about the prior inconsistent statement. Further, the statement sought to be impeached cannot be about a collateral or immaterial matter. *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988).

Jaderborg's testimony regarding Owens' statement was clearly material in that it reflected on Owens' state of mind at the time of the shooting. Carey's testimony would have been that Jaderborg had previously made an inconsistent statement on the same fact. The Court of Appeals correctly determined that the trial court erred in refusing to admit Carey's testimony for the limited purpose of impeaching Jaderborg. However, the Court of Appeals did not address whether the evidentiary error was harmless or prejudicial.

In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

 The record demonstrates that Owens was able to introduce the same evidence Carey was not permitted to offer. During his own testimony, Owens stated that he said, "I hope I didn't shoot somebody" as they drove off. Further, issues of Jaderborg's credibility were properly laid before the jury during Jaderborg's cross-examination. The defense questioned Jaderborg about several inconsistencies between her statements to officers at the time of the incident and her testimony at trial. The defense also questioned her about her own interest in avoiding prosecution for accessory to a felony charges. Finally, the jury was specifically instructed to "closely examine" Jaderborg's testimony in light of her possible motives to be untruthful. Any prejudice which could have resulted from Owens' inability to impeach Jaderborg regarding her testimony as to what Owens said is harmless beyond a reasonable doubt. Carey's testimony was at

best cumulative of Owens' own testimony and, further, the issue of Jaderborg's credibility was aggressively attacked before the jury during her cross-examination. Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *State v. Hartmann*, 239 Neb. 300, 476 N.W.2d 209 (1991).

While the trial court erred in excluding Carey's testimony concerning Jaderborg's prior inconsistent statement, we determine that this error was harmless beyond a reasonable doubt. *State v. Sanchez, supra.*

## CONCLUSION

The jury was properly instructed on the issue of self-defense in determining whether Owens was justified in shooting and killing Kudym. Additionally, the trial court's evidentiary ruling regarding Carey's testimony was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of the Court of Appeals and remand the cause to the Court of Appeals with directions to reinstate the judgment of the district court on all charges.

REVERSED AND REMANDED WITH DIRECTIONS.